WILLIAM F. LEE
(admitted *pro hac vice*)
(william.lee@wilmerhale.com)
DOMINIC E. MASSA
(admitted *pro hac vice*)
(dominic.massa@wilmerhale.com)
JOSEPH J. MUELLER
(admitted *pro hac vice*)
(joseph.mueller@wilmerhale.com)
LOUIS W. TOMPROS
(admitted *pro hac vice*)
(louis.tompros@wilmerhale.com)
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA  02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Attorneys for Plaintiff and Counterclaim Defendant
BROADCOM CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| **BROADCOM CORPORATION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**EMULEX CORPORATION,**<br><br>**Defendant.**<br><br><br><br><br>**And Related Counterclaims** | CASE No. SACV09-1058 JVS (ANx) consolidated SACV 10-03963-JVS (ANx)<br><br>**PLAINTIFF BROADCOM CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ENTRY OF PERMANENT INJUNCTION**<br><br>Before:      Hon. James V. Selna<br>Date:         March 2, 2012<br>Time:        1:30 p.m.<br>Courtroom:  10C<br><br>**FILED UNDER SEAL**<br>PUBLIC REDACTED VERSION |

**HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY**

BROADCOM MEMORANDUM IN SUPPORT OF
MOTION FOR ENTRY OF
PERMANENT INJUNCTION

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................. 1

II. BACKGROUND ........................................................................................... 3

    A.    Broadcom. ...................................................................................... 3

    B.    Emulex. .......................................................................................... 4

    C.    The Convergence of Storage and Data Networking. ...................... 5

    D.    Broadcom and Emulex Are Direct Competitors in the Networking Market. ........................................................................ 5

    E.    Broadcom and Emulex Compete in the Storage Switch Market. ........................................................................................ 10

    F.    Emulex's Products Infringe at Least Two Broadcom Patents. ...................................................................................... 11

    G.    Emulex Consciously Decided to Remain Ignorant of Broadcom's Patents and the Operation of Its Own Products.................................................................................... 13

III. ARGUMENT ............................................................................................. 15

    A.    Courts Regularly Enter Injunctions Where the Plaintiff and Defendant Are Competitors. ..................................................... 15

    B.    The Equities Favor a Permanent Injunction that Bars Emulex from Infringing Broadcom's Patents.................................. 16

IV. CONCLUSION ........................................................................................... 25

TABLE OF AUTHORITIES

<u>FEDERAL CASES</u>

*Acumed LLC v. Stryker Corp.,*

    552 F.3d 1323 (Fed. Cir. 2008) ........................................................................ 17

*Black & Decker Inc. v. Robert Bosch Tool Corp.,*

    No. 04 C 7955, 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006) ......................... 19

*Robert Bosch LLC v. Pylon Manuf. Corp.,*

    659 F.3d 1142 (Fed. Cir. 2011) ................................................................ passim

*Broadcom Corp.* v. Qualcomm Inc.,

    543 F.3d 683 (Fed. Cir. 2008) .................................................................. passim

*Broadcom Corp. v. Qualcomm Inc.,*

    No. SACV05-467, 2007 U.S. Dist. LEXIS 97467 (C.D. Cal. Dec.

    31, 2007) ................................................................................................... 1, 20

*eBay Inc. v. MercExchange, L.L.C.,*

    547 U.S. 388 (2006) ................................................................................. 16, 17

*Hybritech Inc. v. Abbott Labs.,*

    849 F.2d 1446  (Fed. Cir. 1988) ...................................................................... 18

*Int'l Rectifier Corp. v. IXYS Corp.,*

    383 F.3d 1312 (Fed. Cir. 2004) ...................................................................... 24

*i4i Ltd. P'ship v. Microsoft Corp.,*

    598 F.3d 831 (Fed. Cir. 2010) ........................................................................ 21

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC,*

    No. 05-1634, 2007 WL 1231682 (S.D. Tex. Apr. 25, 2007) .......................... 22

*Mytee Prods., Inc. v. Harris Research, Inc.,*

    439 Fed.Appx. 882 (Fed. Cir. 2011) ........................................................ 15, 20

*Novozymes A/S v. Genencor Int'l, Inc.,*

474 F. Supp. 2d 592 (D. Del. 2007) ...................................................................... 18

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,*

No. 2011-1054, 2011 WL 5601460 (Fed. Cir. Nov. 18, 2011)........................ 17

*Odetics, Inc. v. Storage Tech. Corp.,*

14 F. Supp. 2d 785 (E.D. Va. 1998) ................................................................ 24

*Price v. City of Stockton,*

390 F.3d 1105 (9th Cir. 2004) ........................................................................ 23

*Reebok Int'1 Ltd. v. J. Baker, Inc.,*

32 F.3d 1552 (Fed. Cir 1994) ........................................................................ 18

*Rite-Hite Corp. v. Kelley Co.,*

56 F.3d 1538 (Fed. Cir. 1995) ....................................................................... 22

*Smith & Nephew, Inc. v. Arthrex, Inc.,*

No. 2:07-cv-335-TJW-CE, 2010 WL 2522428 (E.D. Tex. Jun. 18,

2010) ............................................................................................................... 24

*Spine Solutions v. Medtronic Sofamor Danek USA, Inc.,*

620 F.3d 1305 (Fed. Cir. 2010) ..................................................................... 24

*TiVo, Inc. v. EchoStar Corp.,*

646 F.3d 869 (Fed. Cir. 2011) ....................................................................... 24

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe*

*Corp.,* Civ. No. H-03-2910,

2006 WL 3813778 (S.D. Tex. Dec. 27, 2006) ............................................... 25

*Xerox Corp. v.* 3Com Corp.,

61 Fed.Appx. 680 (Fed. Cir. 2003) ............................................................... 22

## FEDERAL STATUTES

35 U.S.C. § 154(a)(1) ........................................................................................... 17

# I.    INTRODUCTION

The Court has ruled, as a matter of law, that Emulex infringes two Broadcom patents: U.S. Patent No. 7,058,150 (the '150 patent), and U.S. Patent No. 7,471,691 (the '691 patent).  These patents cover two distinct and important technologies.  The invention of the '150 patent allows multiple sets of Serializer-Deserializer ("SerDes") circuitry to be combined on a single chip and, in so doing, improves the performance while lowering the cost of commercially successful high-speed data communication devices.  The invention of the '691 patent combines the benefits – while avoiding the drawbacks – of two storage switch architectures, thereby enabling switches that offer both simplicity and flexibility at a lower cost than would otherwise be possible.

Courts regularly grant permanent injunctions where the patentee and infringer compete.  *See, e.g., Broadcom Corp. v. Qualcomm Inc.*, No. SACV05-467, 2007 U.S. Dist. LEXIS 97467, at *11 (C.D. Cal. Dec. 31, 2007) ["*Broadcom (Order)*"] (affirmed in relevant part, *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 702-03 (Fed. Cir. 2008) ["*Broadcom (Appeal)*"]).  There can be no dispute that Emulex and Broadcom are competitors; indeed, Emulex itself has asserted that it poses a "substantial direct threat" to Broadcom.[1]  Given the parties' direct (and indirect) competition, each factor of the traditional four-part *eBay* analysis weighs strongly in favor of entering a permanent injunction barring Emulex from further infringement of Broadcom's patents.

***Irreparable Harm***:  This case presents exactly the sort of irreparable harm

---

[1]    First Amended Complaint, *Emulex Corporation v. Broadcom Corporation*, No. 8:09-cv-01310-JVS-RNB  (C.D. Cal. Jan. 4, 2010) ("Emulex Complaint"), at ¶ 27; █████████████████████████████████████████████████

1   that necessitates injunctive relief.  Unless enjoined, Emulex will continue to

2   compete unfairly against Broadcom, using Broadcom's patented technology to

3   achieve design wins at Broadcom's expense and to further diminish Broadcom's

4   market share, both now and in the future.

5        ***No Adequate Remedy at Law***:  Damages alone cannot suffice to remedy the

6   harm that would be done to Broadcom by Emulex's continued infringement.

7   Success in the relevant markets is measured in design wins, and design wins do not

8   yield readily quantifiable financial rewards.  The detrimental effect Emulex's

9   continued infringement would have on Broadcom's share of the relevant markets is

10   inherently unpredictable.  And the benefits of "incumbency" – which gives the

11   winner of a current design competition an edge in future design competitions – are

12   substantial but, again, difficult to quantify reliably in monetary terms.

13        ***Balance of Harms***:  Requiring Broadcom "to compete against its own

14   patented invention" is "a substantial hardship."  *Robert Bosch LLC v. Pylon Manuf.*

15   *Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) (remanding with instructions to enter

16   a permanent injunction against an infringing competitor).  Furthermore, in light of

17   Emulex's conduct, it cannot reasonably contend that the balance of harms weighs

18   in its favor.  Emulex has been on notice of Broadcom's asserted patents for over

19   two years, but made a "conscious decision" not to ask its suppliers for documents

20   that would provide the information necessary to investigate Broadcom's

21   infringement claims and pursue a design-around that would avoid infringement.

22   Instead, Emulex chose a policy of studied ignorance while continuing to release

23   new infringing products and publicize its infringing design wins to Broadcom's

24   detriment.  Even after the Court found infringement of the '150 patent as a matter

25   of law, Emulex minimized the implications, issuing public statements that it would

26   assure "continued product supply and support."  (Liss Decl. Ex. B (Emulex press

27   release dated October 13, 2011).)  Given the substantial and irreparable injury to

Broadcom that will continue in the absence of an injunction, and the fact that Emulex itself plans to "implement design changes" to "ensure continued product supply and support," the balance of harms weighs in Broadcom's favor.

*Public Interest*:  Because the public has an abiding interest in maintaining the integrity of the patent system by enforcing patent rights, and has an interest in promoting fair competition, the public interest favors Broadcom.

Each of these traditional factors supports the entry of a permanent injunction barring Emulex from continuing to infringe Broadcom's patents.  Accordingly, Broadcom respectfully requests that the Court enter an injunction in the form Broadcom has proposed.

## II.   BACKGROUND

### A.   Broadcom.

Founded in 1991, Broadcom has grown from a two-person startup into a company employing nearly 10,000 people around the world today, including roughly 7,500 engineers.  (Trial Transcript ("Trial Tr.") 9/21/2011 at 120, 127 (Samueli).)  Broadcom's 2010 revenue was $6.82 billion.  (Liss Decl. Ex. C ("Broadcom At a Glance").)

For the past two decades, Broadcom has been a driving force in the technological development and expansion of Ethernet, a communications protocol. (Trial Tr. 9/21/2011 at 125-26 (Samueli).)  Ethernet is now the established standard for wired networks, and Broadcom is a leader in Ethernet technology. (Trial Tr. 9/21/2011 at 124, 126 (Samueli).)  Broadcom's products now include Ethernet controllers for consumer-oriented products as well as server and switch products forming the backbone of the telecommunications infrastructure and large data centers.  (Trial Tr. 9/21/2011 at 126-27, 134-35 (Samueli).)

Broadcom owns approximately 5,700 United States patents and 7,600 pending applications.  (Liss Decl. Ex. C ("Broadcom At a Glance").)  Broadcom

uses its intellectual property for competitive differentiation.[2]  (Trial Tr. 10/5/2011 at 85:12-21 (Davis); ███████████████████████████████████████████ ███████████████████████████████████   As Dr. Samueli explained:

> Roughly 25 percent of [Broadcom's] revenue, which last year would be well over a billion and a half dollars, [is] invested in research and development, to invent new technologies and new products, and it's very important to protect those new inventions with patents so that you can go into the marketplace and feel that other companies aren't going to use your technology to compete against you.

(Trial Tr. 9/21/2011 at 140-41 (Samueli).)  Aside from broad cross-licenses, typically in connection with litigation settlements, Broadcom generally does not license its patents.  (Trial Tr. 10/5/2011 at 85:4-11 (Davis).)  Broadcom has not individually licensed either the '150 patent or the '691 patent to anyone, much less to a competitor.  (*Id.*)

## B.   Emulex.

Emulex, founded in 1979, has approximately 900 employees and net revenues of $453 million for the last fiscal year.  (Trial Tr. 9/28/2011 at 24:11-17 (McCluney); Liss Decl. Ex. E (Emulex Fiscal Year 2011 Annual Report) at 30.)  Emulex's focus, until recently, has been Fibre Channel.  (Trial Tr. 9/28/2011 at 24:11-24 (McCluney).)  Like Ethernet, Fibre Channel is a data communications protocol.  (Trial Tr. 9/28/2011 at 17:25-18:9 (McCluney).)  Emulex's traditional Fibre Channel product lines include boxed switches, embedded switches (sometimes referred to as "switch on a chip"), network bridges, and Host Bus Adapters.  (*Id.* at 25:12-20, 29:13-16; *see generally* www.emulex.com/products.html.)

---

[2]   Testimony relevant to the use and importance of Broadcom's patents is compiled in Part IV of Appendix A.

## C.    The Convergence of Storage and Data Networking.

Over time, Ethernet has become progressively faster, more reliable, and is now the most widely used networking protocol in computing.  (Trial Tr. 9/21/2011 at 124, 130-31, 134-37 (Samueli).)  In enterprise-level market segments, such as data centers, the industry is in the midst of a transition from Gigabit Ethernet (*i.e.*, one gigabit per second) to 10-gigabit Ethernet ("10GbE").[3]  These improvements – and particularly the advent of 10GbE – have allowed the development of hybrid storage/networking technologies which run on an Ethernet (rather than Fibre Channel) backbone.[4]  Among them are (1) "lossless Ethernet;" (2) "Fibre Channel over Ethernet" ("FCoE"); and (3) "Internet-Small Computer Systems Interface" ("iSCSI"), all of which use Ethernet networks to carry storage data traffic.[5]

## D.    Broadcom and Emulex Are Direct Competitors in the Networking Market.[6]

### 1.    Broadcom and Emulex offer competing 10GbE products.

Broadcom's 10GbE products include its earlier-generation BCM57710 and BCM57711, its current generation 10GbE chip is the BCM57712, and its next generation of 10GbE products include the BCM57800, BCM57810 and BCM57840.  (Declaration of Robert Lusinsky ("Lusinsky Decl.") at ¶ 11; Liss

---

[3]    Until recently, Gigabit Ethernet was the state-of-the-art for enterprise networking applications.  (Lusinsky Decl. at ¶ 6.)  Beginning in 2008, 10GbE increased in both availability and importance.  (*Id.*; ███████████████████████████████████ ████████████████████ .)

[4]    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[5]    *See* Trial Tr. 9/21/2011 at 126, 135-36 (Samueli); ███████████████████████████████████████████████████████ ; Declaration of Eric Hayes ("Hayes Decl.") at ¶¶ 10-13.

[6]    Testimony relevant to direct competition between Broadcom and Emulex is compiled in Part I of Appendix A.

Decl. Ex. I (Broadcom 10GbE Product Briefs).)  Emulex's 10GbE controller chips

include the BladeEngine 2 ("BE2") and BladeEngine 3 ("BE3").  (Liss Decl. Ex. _

(Emulex 10GbE Data Sheets).)  Emulex's next-generation Lancer chip (currently

marketed by Emulex as XE201) offers 10GbE as well as "native" Fibre Channel

connectivity.[7]  (*Id.*)  Broadcom's BCM57710, BCM57711, and BCM57712

compete directly against the BE2, and BCM57712, BCM57800, BCM57810, and

BCM57840 compete directly against the BE3.[8]  (Lusinsky Decl. at ¶ 12.)  To the

extent that XE201 is marketed for 10GbE or FCoE applications, it will necessarily

compete with current or future Broadcom 10GbE products.

　　　Both parties' 10GbE products can be configured to handle multiple different

protocols.  All six Broadcom 10GbE chips provide Ethernet networking and are

configurable as iSCSI "host bus adapters" ("HBAs"), and four – BCM57712,

BCM57800, BCM57810, and BCM57840 also support FCoE.  (Lusinsky Decl. at ¶

11; Liss Decl. Ex. I (Broadcom 10GbE Product Briefs).)  The BE2 and BE3 offer

Ethernet networking, iSCSI, and FCoE protocols, and XE201 supports Ethernet

and FCoE.  (Liss Decl. Ex. J (Emulex 10GbE Data Sheets).)[9]  In storage settings,

lossless Ethernet, iSCSI, and FcoE are alternative means to the same end – the

---

[7]　All three of Emulex's 10GbE chips infringe the '150 patent.  (Trial Tr.
10/5/2011 at 183; *see also* Dkt. No. 994, Order Denying Defendant's Motion
for Judgment as a Matter of Law on the Basis of Non-Infringement of the '150
Patent.)

[8]　XE201 is being released as a Fibre Channel product first, but is "capable of
being an ethernet-based product as well."  (Trial Tr. 9/28/2011 at 83:20-84:2
(McCluney); Liss Decl. Ex. J (Emulex 10GbE Data Sheets).)

[9]　Both parties also offer products which incorporate 10GbE controllers into
adapter cards.  Emulex sells completed Converged Network Adapters
("CNAs") (Liss Decl. Ex. K (Emulex NIC Product Page), whereas Broadcom
offers "reference designs" which OEMs can use to implement adapter card
products.  (Lusinsky Decl. at ¶ 11.)

1   convergence of networking and storage infrastructure.

2   **2.    "Design wins" are crucial to success in the 10GbE market.**

3   For the most part, Broadcom and Emulex do not sell their competing 10GbE

4   products to end users; rather, they seek business from a small group of original

5   equipment manufacturers ("OEMs") to design their 10GbE chips into servers,

6   which the OEMs then sell to end users.  (Lusinsky Decl. at ¶ 7.)  In particular,

7   Broadcom and Emulex compete fiercely for business from four "tier one" OEMs –

8   Hewlett-Packard ("HP"), IBM, Dell, and Cisco – which collectively supply the

9   majority of the server market.  (*Id.* at ¶ 8; ███████████████████████████

10  ████████████████████████████████████████████████████.)

11  An agreement with a particular OEM to build a particular 10GbE chip into a

12  particular line of servers is known as a "design win."  (Lusinsky Decl. at ¶ 16.)

13  Tier one OEMs ordinarily update their server offerings – and award new design

14  wins – with each new generation of Intel server processor.  (*Id.* at ¶ 20.)  Intel

15  released the "Tylersburg" processor in 2009 and the "Westmere" processor in

16  March 2010, and is scheduled to provide authorization for OEMs to ship products

17  with the next-generation "Romley" processor in late February 2012.  (*Id.* at 22.)

18  Design wins are not simply sale-by-sale decisions; rather, they represent the

19  culmination of a process that includes multiple stages and carries with it

20  ramifications that can last for years.  (*Id.* at ¶ 23; ███████████████████.)

21  A tier one OEM typically begins the design win process by issuing requests for

22  quotations ("RFQs") to select suppliers, who respond with an evaluation of their

23  product roadmap in relation to the OEM's requirements.  (Lusinsky Decl. at ¶ 18.)

24  In some circumstances the RFQ process is followed by or includes a

25  "qualification" process in which supplier and OEM engineers work together to

26  evaluate whether the supplier's proposed solution will function to the OEM's

27  satisfaction.  (*Id.* at ¶ 19.)

1    Design wins in the server networking market create familiarity and

2    confidence that yields an incumbency effect, which can carry over from one design

3    cycle to the next.  (*Id.* at ¶ 23; ███████████████████████████

4    ██████████████████████████████████████████

5    ████████████████████████████).)  The design win process

6    involves a significant investment of money, time, and effort on the part of both the

7    chip supplier and the OEM, and OEMs and suppliers generally do not redesign

8    their products from the ground up from one Intel processor generation to the next.

9    (Lusinsky Decl. at ¶ 23.)  This increases the likelihood that the supplier and OEM

10   will continue to harvest their initial investment through future contracts.  (*Id.* at ¶¶

11   23, 26.)  Furthermore, in the 10GbE market, end users tend to be risk-averse and

12   conservative with respect to suppliers, products, and the software used to configure

13   10GbE controllers.  (*Id.* at ¶ 24.)  Therefore the incumbency effect has been

14   particularly strong; end users encourage OEMs to provide continuity in supplier's

15   chips from one product generation to the next.  (*Id.* at ¶ 24.)

16   In preparation for the release of Romley, OEMs have awarded design wins

17   for Romley-based servers.  (*Id.* at ¶ 27.) ████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████

21   ██████████████████████████████████████

22   ████████████████████████████████████████████

23   ██ ████████████████████████████████████

24   ██████████████████████████████████████████████

25   █████████████████████████████████████

26   █████████████████████████████████████Consequently,

27   despite the fact that Broadcom also now offers a robust FCoE solution (Liss Decl.

1 Ex. AF (Demartek Broadcom FCoE/iSCSI Adapter Evaluation); Lusinsky Decl. at

2 ¶ 14),

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████

### 3. Using infringing products, Emulex has gained Ethernet market share at Broadcom's expense.

Since 2009, Emulex has used its infringing products to achieve several important 10GbE design wins at tier one OEMs over Broadcom.[10]  Emulex has extensively publicized those design wins in an effort to build goodwill, burnish its reputation, and entrench its incumbency at OEMs.  (*E.g.*, Liss Decl. Ex. O (Emulex Press Release dated August 27, 2009).)

███████████████████████████████

████████████████████████████

██████████████████████████

█████████████████████████████

███████████████████████████

████████████████████████████

███████████████████████████

█████████████████████████████

██████████

███████████████████████

---
[10] ████████████████████████████████

██████████████████████████

**E.**   **Broadcom and Emulex Compete in the Storage Switch Market.**[11]

**1.**   **Broadcom and Emulex offer storage switch products.**

Broadcom and Emulex both offer products in the storage switch market. Broadcom's current generation BCM56840 and predecessor BCM56820 switch chips are designed in to forthcoming data center and Storage Area Network ("SAN") applications.  (Hayes Decl. at ¶¶ 16-17.)

Emulex's "InSpeed" switch chips include the SOC320, SOC422, and SOC442 products.  (Trial Tr. 9/23/2011 at 136 (Vahdat).)

**2.**   **Broadcom and Emulex compete indirectly in the storage switch market.**

The development of lossless Ethernet has furthered the convergence of storage and communications by allowing end users to avail themselves of Ethernet's lower costs and greater flexibility.  (Hayes Decl. at ¶¶ 10-12.)  At the SAN level, for example, alternatives include iSCSI. ██████████████████ ████████████████████████████████████ ████████████████████ Broadcom has offered iSCSI-capable products,

---

[11]   Testimony relevant to protocol-level competition between Broadcom and Emulex is compiled in Part II of Appendix A.

1   including both Ethernet controllers and top-of-rack switch controllers, for years.

2   (Hayes Decl. at ¶ 11; Lusinsky Decl. at ¶ 11.)

3   By supporting protocols such as iSCSI, FCoE, and lossless Ethernet,

4   Broadcom offers Ethernet switches as feasible alternatives to Fibre Channel

5   switches.  (*Id.* at ¶ 13; ███████████████████████████████████████

6   ██████████████████████████████████████████████████████████████████

7   ████████████████████████████████.)  In the storage market, Broadcom thus

8   engages in protocol-level competition with Emulex.

9   **F.**    **Emulex's Products Infringe at Least Two Broadcom Patents.**

10          **1.**    **The '150 Patent.**

11                  **a.**    **The '150 patent covers key technology for multi-lane controllers.**

12   The '150 patent, titled "High-Speed Serial Data Transceiver and Related

13   Methods," resulted from the work of Dr. Michael Le and others at Broadcom.

14   (Trial Tr. 9/21/2011 at 146:21-147:1 (Samueli); Trial Tr. 9/27/2011 at 61:15-23

15   (Le).)  The '150 patent discloses "key technology" used in numerous Broadcom

16   products.  (Trial Tr. 9/21/2011 at 147:18-148:4 (Samueli); Trial Tr. 9/27/2011 at

17   87:18-24 (Le).)  Through the use of phase interpolators for clock and data recovery

18   in SerDes circuitry, the technology of the '150 patent eliminates critical

19   interference problems which plagued earlier attempts to combine multiple high-

20   speed lanes for receiving data on a single chip.  (Trial Tr. 9/21/2011 at 146:21-

21   148:4 (Samueli); Trial Tr. 9/27/2011 at 63:24-64:4, 69:20-71:16, 75:9-23, 95:1-12

22   (Le).)  This allows lanes to be placed not only on the same chip but also closer

23   together, reducing chip quantity and size in relation to cost and power usage.  *Id.*

24   The invention of the '150 patent therefore "enable[s] the commercial success" of

25   products which utilize it (Trial Tr. 10/5/2011 at 22:6-22 (Stojanovic)), such as

26   Broadcom's and Emulex's 10GbE chips.

27

**b.     Emulex infringes the '150 patent.**

Both the BE3 and BE2 chips are or have been sold by Emulex as a standalone chip, and as the key component of Emulex's "OneConnect" storage and networking communications adapters.  (Liss Decl. Ex. K (Emulex NIC Product Page).)  BE3 and BE2 are both marketed as configurable for use in Ethernet, iSCSI, and FCoE applications.  (Liss Decl. Ex. J (Emulex 10GbE Data Sheets).)  Similarly, Emulex markets the XE201 (*i.e.*, Lancer) as a standalone controller chip and as the key component in its new generation of LightPulse HBAs.  (Liss Decl. Ex. J (Emulex 10GbE Data Sheets), Ex. T (Emulex LPe16000 Data Sheet).)

The SOC442 is a 32-port switch on a chip capable of transferring data at 2, 4, or 8 Gbps per port.  (Liss Decl. Ex. U (Emulex SOC442 Data Sheet).)  SOC442 supports native Fibre Channel and other storage access protocols.  (*Id.*)

The Court ruled that these four Emulex products infringe the '150 patent as a matter of law.  (Trial Tr. 10/5/2011 at 183; *see also* Dkt. No. 994, Order Denying Defendant's Motion for Judgment as a Matter of Law on the Basis of Non-Infringement of the '150 Patent.)

**2.     The '691 Patent.**

**a.     The '691 patent covers beneficial switch architecture.**

The '691 patent, titled "Fibre Channel Arbitrated Loop Bufferless Switch Circuitry to Increase Bandwidth Without Significant Increase in Cost," teaches a novel switch architecture combining some of the "best properties" of the older "arbitrated loop" and "fabric switch" methodologies and adding additional beneficial features.  (Trial Tr. 9/23/2011 at 146:13-147:3 (Vahdat).)  The invention of the '691 patent offers both the "simplicity and low cost" of arbitrated loop and the "ability to support multiple conversations" of fabric switching, along with additional features that makes the architecture "even more powerful."  (*Id.*)

**b.     Emulex infringes the '691 patent.**

Like the SOC442, the SOC320 and SOC422 are Fibre Channel switch-on-a-chip ("SOC") products used to connect and allow the transmission of data between storage devices.  (Trial Tr. 9/23/2011 at 136:10-18 (Vahdat).)  The three offer varying numbers of ports and support varying data transfer rates. (Trial Tr. 9/23/2011 at 159:7-18 (Vahdat).)  In all other respects, including all respects bearing on infringement of the '691 patent, they operate identically.  (*Id.*)

The Court has held that these three products (and Sequoia, a custom design incorporating SOC442) infringe claim 7 of the '691 patent as a matter of law. (Dkt. No. 993, Order Granting Motion for JMOL re: '691 Patent, at 3, 7.)[12]

## G.  Emulex Consciously Decided to Remain Ignorant of Broadcom's Patents and the Operation of Its Own Products.[13]

In response to Broadcom's infringement allegations, Emulex deliberately chose a "head in the sand" strategy.  At trial, Emulex repeatedly asserted that it had no idea how certain of the infringing components in its accused products operated because the components were made by its suppliers.  (Trial Tr. 9/28/2011 at 46:3-48:21, 58:16-59:18 (McCluney).)  But rather than fully inform itself about the components Emulex's suppliers were putting into the infringing products that Emulex sold, and working with its suppliers to redesign its products to steer clear of Broadcom's patents, Emulex made a deliberate and "conscious decision" not to even ask its suppliers for the product schematics.  (Trial Tr. 9/28/2011 at 63 (McCluney) ("Q.  Is it correct to say that Emulex made a conscious decision not to ask its suppliers for the schematics?  A.  I would say that's correct."); Trial Tr. 9/30/2011 at 195:18-196:2 (Warren) (same).)

---

[12]  Emulex is no longer seeking design wins for the SOC320 and SOC422 products.

[13]  Testimony relevant to Emulex's "head in the sand" strategy is compiled in Part III of Appendix A.

1    Emulex's explanation – that its suppliers would not have disclosed how the

2    infringing components worked – makes little sense.  Emulex was paying "tens of

3    millions of dollars" each year to its suppliers, and surely had ample leverage to

4    find out how these components worked.  (Trial Tr. 9/28/2011 at 61:20-62:3

5    (McCluney).)  Furthermore, Emulex readily collaborated with its suppliers in

6    design and redesign efforts for commercial purposes, and Emulex and it suppliers

7    had concededly shared proprietary technical information in the past under

8    nondisclosure agreements.  (Trial Tr. 9/28/2011 at 105:18-106:20 (Arment); Trial

9    Tr. 9/30/2011 at 189:5-15, 192:2-194:21 (Warren).)  Perhaps most importantly, the

10   supplier of Emulex's BE3 and XE201 chips was participating in this litigation ███

11   ██████████████████████████████████████████████ to such an

12   extensive degree that one of that supplier's attorneys appeared at trial on Emulex's

13   behalf.  (*See* Trial Tr. 9/27/2011 at 204-06.)  Despite Emulex's extensive financial,

14   technical, and legal collaboration with its suppliers, "not once" did Emulex ask

15   those suppliers for technical documentation that would explain how the accused

16   components operate.  (Trial Tr. 9/28/2011 at 61:20-63:21 (McCluney); Trial Tr.

17   9/30/2011 at 194:1-196:2 (Warren).)

18   Emulex's strategy of willful ignorance extends beyond its decision not to ask

19   its suppliers for technical documents.  First, █████████████████████

20   ██████████████████████████████████████████████████████

21   ████████████████████████████████████ Second, none of

22   Emulex's upper management or lead technical personnel read any of Broadcom's

23   asserted patents for almost 18 months.[14]  It is therefore unsurprising that ten

---

14   Trial Tr. 9/28/2011 at 52:11-57:17 (McCluney) ("Q. So we have the triumvirate
     running the company, Folino, Benck, Mr. McCluney, 19 months after this
     lawsuit was filed, and you haven't even done what we're asking the jury to do,
     read the patent; correct? A. Absolutely; that's correct."); ██████████████

(CONTINUED)

Emulex witnesses confirmed in depositions and at trial that Emulex, having made a conscious decision to remain ignorant of the workings of its own products, never attempted to take **any** steps to redesign **any** of its products in order to avoid further infringing Broadcom's asserted patents.[15]  This is true not only of Emulex's products predating Broadcom's complaint, but also Emulex's XE201 chip, which was in development throughout this litigation and even at the time of trial had not yet been released.  (Trial Tr. 9/28/2011 at 88:13-19 (McCluney).)

## III.   ARGUMENT

### A.   Courts Regularly Enter Injunctions Where the Plaintiff and Defendant Are Competitors.

Injunctive relief is particularly appropriate where the patentee and infringer compete.  *See, e.g., Bosch*, 659 F.3d at 1146 (remanding with instructions to enter a permanent injunction against an infringing competitor); *Mytee Prods., Inc. v. Harris Research, Inc.*, 439 Fed.Appx. 882, 887-88 (Fed. Cir. 2011) (nonprecedential) (affirming permanent injunction against competitor); *Broadcom (Appeal)*, 543 F.3d at 702-03 (affirming permanent injunction against competitor).

The competition between Broadcom and Emulex is extensive and multifaceted.[16]  First, the two companies offer directly competitive 10GbE controller chips.  *See* Part D, *supra*.  Emulex has extensively publicized its design wins over Broadcom.  (*E.g.*, Liss Decl. Ex. O (Emulex Press Release dated August 27, 2009).)  Emulex's executives have acknowledged that Emulex's success in



[15]  Trial Tr. 9/28/2011 at 60:16-61:4 (McCluney); *see also* Part III of Appendix A.
[16]  *See* Parts I-II of Appendix A.

1    10GbE has come at Broadcom's expense. ████████████████████

2    ████████████████████████████████████████████████

3    ████████████████████████████████████████████████

4    ████████████████████████████████

5        Second, although Broadcom does not sell Fibre Channel switches, its switch

6    offerings compete indirectly with Emulex's Fibre Channel switches, just like

7    Broadcom's WCDMA wireless chips competed indirectly against Qualcomm's

8    CDMA chips – which this Court enjoined in a decision that the Federal Circuit

9    affirmed. *Broadcom (Appeal)*, 543 F.3d at 703 ("the district court did not abuse its

10   discretion in finding that allowing Qualcomm to sell CMDA2000 chips

11   implementing Broadcom's patented features would harm Broadcom's efforts to

12   market WCDMA solutions").

13       **B.**    **The Equities Favor a Permanent Injunction that Bars Emulex**
     **from Infringing Broadcom's Patents.**
14

15       The traditional four-part test for injunctive relief applies to patent

16   infringement cases:  (1) whether the plaintiff has suffered an irreparable injury; (2)

17   whether money damages are inadequate to compensate for that injury; (3) whether

18   the balance of hardships between the parties warrants equitable relief; and (4)

19   whether the public interest would not be disserved by injunctive relief. *eBay, Inc.*

20   *v. MercExchange, L.L.C.*, 547 U.S. 388, 391-92 (2006).

21       Historically, courts applying these equitable principles "have granted

22   injunctive relief in the vast majority of patent cases." *Id.*, at 395 (Roberts, C.J.,

23   concurring).  Though this remedy is no longer automatic, *id.*, at 393-94, "it does

24   not follow that courts should entirely ignore the fundamental nature of patents as

25   property rights granting the owner the right to exclude." *Bosch*, 659 F.3d at 1145

26   (remanding with instructions to enter a permanent injunction).  Rather, the

27   patentee's right to exclude and the harm that inherently follows from the loss of

1  that right remain extremely important factors in assessing the propriety of

2  injunctive relief.  *See eBay*, 547 U.S. at 395 (Roberts, C.J., concurring).

### 1.    Broadcom Will Suffer Irreparable Harm Without a Permanent Injunction.[17]

5  The right to exclude others from using the patented invention for a limited

6  period of time is the "fundamental nature" of a patent.  *See* 35 U.S.C. § 154(a)(1);

7  *see also Bosch*, 659 F.3d at 1149 (citing U.S. Const. art. I, § 8, cl. 8).  An

8  encroachment upon that right – for any period of time – suggests immediate and

9  irreparable harm.  *See Acumed LLC v. Stryker Corp.*, 552 F.3d 1323, 1328 (Fed.

10  Cir. 2008) ("In view of [the right to exclude], infringement may cause a patentee

11  irreparable harm not remediable by a reasonable royalty.").  Furthermore, the

12  "wisdom" of past practice – *i.e.*, the nearly-automatic grant of injunctive relief

13  upon a finding of patent infringement – "is particularly apt in traditional cases,

14  such as this, where the patentee and adjudged infringer both practice the patented

15  technology."  *Bosch*, 659 F.3d at at 1150.[18]

16  Broadcom has already lost substantial 10GbE market share ███████████

17  ████████████████████████████████████████████████, as well as

18  the invaluable benefits of its incumbency.  ██████████████████████████

19  ███████████████████████████████████████████

20  █████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ███████████████████    Broadcom's loss of market share amply supports

23  prospective injunctive relief.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

---

[17]  *See* Parts I-II of Appendix A.

[18]  Broadcom's 10GbE products – like Emulex's – practice the invention of the '150 patent.  (Trial Tr. 9/21/2011 at 147:18-148:4 (Samueli); Trial Tr. 9/27/2011 at 87:18-24 (Le).)  Broadcom does not practice the '691 patent.

1  *Co., Ltd.*, No. 2011-1054, 2011 WL 5601460, at \*8-\*9 (Fed. Cir. Nov. 18, 2011)

2  (nonprecedential) (loss of market share is relevant to prospective relief even

3  though it constitutes past damages).

4       Similarly, although Broadcom does not compete head-to-head, product-by-

5  product with the InSpeed devices, Emulex's Fibre Channel design wins reduce the

6  likelihood of end user customers opting for Broadcom's products implementing

7  alternative protocols. *Broadcom (Appeal)*, 543 F.3d at 702-03 (affirming district

8  court's grant of injunction in context of competing telecommunications protocols).

9  This, too, is irreparable harm.  (*See id.*)

## 2.    There Is No Adequate Remedy at Law for Emulex's Infringement.[19]

12       The patent statute "provid[es] injunctive relief to preserve the legal interests

13  of the parties against future infringement which may have market effects never

14  fully compensable in money." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446,

15  1457 (Fed. Cir. 1988) (affirming preliminary injunction against competitor).

16  Money damages would be wholly inadequate to compensate Broadcom for the

17  harm it would suffer if Emulex is permitted to continue its unauthorized use of two

18  of Broadcom's patented technologies.

### a.    Money damages cannot adequately compensate Broadcom for loss of exclusive use of its technology.

20       The Court cannot reasonably value the loss to Broadcom of its right to

21  exclude its rivals from practicing the '150 and '691 patents.  *See, e.g., Reebok Int'l*

22  *Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir 1994) ("Because the principal

23  value of a patent is its statutory right to exclude, the nature of the patent grant

24  weighs against holding that monetary damages will always suffice to make the

25  patentee whole."); *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592,

---

[19]  *See* Part I of Appendix A regarding the nature and importance of design wins.

613 (D. Del. 2007) ("[T]he statutory right to exclude represents a benefit that, under these circumstances, cannot be equated by an award of cash."). This difficulty is of particular salience here because Broadcom's general practice is to differentiate itself using proprietary technology and not to license its patents.[20]

### b. The harm to Broadcom from Emulex's infringement defies monetary compensation.

For at least two additional reasons, the harm to Broadcom from Emulex's continued infringement cannot adequately be compensated by money damages.

*First*, the Court has no reliable way to determine how much additional market share Broadcom would secure in the future, but for Emulex's continued infringement (if not enjoined). (Declaration of Julie Davis ("Davis Decl.") at ¶¶ 24-25, 27); *see Black & Decker Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2006 WL 3446144, at *4 (N.D. Ill. Nov. 29, 2006) ("[A] patent owner's right to exclude 'cannot be compensated through monetary damages,' especially because it is impossible to determine the portions of the market the patent owner would have secured but for the infringer....") (citation omitted). The fact that Emulex's 10GbE infringement has coincided with a major industry shift (from Gigabit Ethernet) compounds the fundamentally speculative nature of this inquiry, as does the presence of other suppliers in the relevant markets. (Davis Decl. at ¶ 17, 24); *see Bosch*, 659 F.3d at 1151 (remanding for entry of injunction when district court made "legal error" by concluding that "the presence of additional competitors" in the market precluded injunctive relief).

*Second*, each design win brings not only revenue but the attendant benefits of incumbency, including the increased likelihood of generating trust and goodwill with the OEMs and securing additional design wins on future products. (Lusinsky

---

[20]   *See* Part IV of Appendix A.

1  Decl. at ¶ 23; Hayes Decl. at ¶ 8 n.1; ████████████████.)  Such benefits

2  are significant but difficult to quantify. ██████████████████  The trust and

3  goodwill generated by the success of a design win can also translate into additional

4  design wins with that OEM involving the supplier's other products.  (Lusinsky

5  Decl. at ¶¶ 23-24; Hayes Decl. at ¶ 8 n.1; ████████████████████

6  ███████████████████████████████████████████████

7  █████████.)  *See Broadcom (Order)*, 2007 U.S. Dist. LEXIS 97467, at *11 ("A

8  successful [infringing] firm not only wins a sale, but by doing so also procures a

9  blocking position that immunizes it for a period of time from competitive

10  products").  The value of incumbency cannot adequately be compensated by a

11  compulsory license, which would permit Emulex to forge such relationships with

12  OEMs using products containing Broadcom's own proprietary technology.  *See*

13  Davis Decl. at ¶ 24; *Broadcom (Order)*, 2007 U.S. Dist. LEXIS 97647, at *26

14  ("the structural nature of a 'design win' market favors a finding that monetary

15  damages are inadequate.").  Lost market share is thus a prospective indicator of

16  harm in addition to a retrospective calculation.  (Davis Decl. at ¶¶ 17, 24-25.)[21]

17         **3.**      **The Balance of Hardships Heavily Favors Broadcom.[22]**

18       Emulex has been on notice for over two years of Broadcom's intention to

19  seek injunctive relief.  (Dkt. No. 1, Complaint, at ¶ 94; Dkt. No. 34, Joint Rule

20  26(f) Report, at 4:16-17.)  Emulex should not be heard now to complain of the

21  consequences of its own inaction.

22       Only post-trial, after over two years of litigation and ample warning

23
24
25
26
27

---

[21]  The Federal Circuit has squarely rejected Emulex's argument (*see* Dkt. No. 988, Joint Status Report, at 5-6) that Broadcom is not entitled to a permanent injunction where it did not seek lost profits.  *See Mytee Prods.*, 439 Fed.Appx. at 887; *see also Broadcom (Order)*, 2007 U.S. Dist. LEXIS 97467 (ordering permanent injunction although Broadcom did not seek lost profits damages).

[22]  *See* Part III of Appendix A.

1   regarding Broadcom's intention to seek injunctive relief, did Emulex acknowledge

2   the need to avoid infringing Broadcom's patents.  (Liss Ex. B (Emulex Press

3   Release dated October 13, 2011).)  In the meantime, ████████████████

4   ████████████████████████████████████, and made a

5   "conscious decision" not to investigate and implement changes to the design of any

6   of the accused products.  *See* Part G, *supra*.[23]  Given Emulex's cavalier approach,

7   it cannot credibly complain of hardship.

8          Furthermore, the bulk of Emulex's present revenue stream would remain

9   unaffected by Broadcom's proposed injunction.  For fiscal year 2011, Emulex's

10  revenue from United States sales of its infringing products constituted only 3.22%

11  of its company-wide revenue.  (Davis. Decl. at ¶ 30.)  To be sure, Emulex expects

12  its future growth to come from 10GbE, but that does not shift the balance of harms.

13  "One who elects to build a business on a product found to infringe cannot be heard

14  to complain if an injunction against continuing infringement destroys the business

15  so elected."  *Broadcom (Appeal)*, 543 F.3d at 704 (quoting *Windsurfing Int'l, Inc.*

16  *v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)).[24]

17          **4.     The Public Interest Would Not Be Disserved by Broadcom's**

18                   **Proposed Injunction.**

19          "[T]he touchstone of the public interest factor is whether an injunction, both

20  in scope and effect, strikes a workable balance between protecting the patentee's

21  rights and protecting the public from the injunction's adverse effects."  *i4i Ltd.*

22  *P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) (affirming injunctive

23  relief), *aff'd*, 131 S.Ct. 2238 (2011).  Public needs weighing against injunctive

24  ────────────────

25  [23]   *See also* Part III of Appendix A.

26  [24]   Similarly, Emulex "cannot escape an injunction simply because it is smaller
            than the patentee."  *Bosch*, 659 F.3d at 1156 (citing *Windsurfing*, 782 F.2d at

27          1003 n.12).

relief "have typically been related to public health and safety." *Xerox Corp. v. 3Com Corp.*, 61 Fed.Appx. 680, 685 (Fed. Cir. 2003) (ordering the district court to enter a permanent injunction in the event of a finding of infringement). No such concerns are present here.

### a. Broadcom's right to exclude outweighs the limited effect of an injunction on Emulex's customers.

Broadcom treats the right to exclusive use of its patented technology as a valuable asset. Because there is a strong public interest in maintaining the integrity of the patent system, the public interest factor generally favors the patentee seeking an injunction. *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995) (en banc); *MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, No. 05-1634, 2007 WL 1231682, at *15 (S.D. Tex. Apr. 25, 2007) ("The public interest is best served by protecting patent rights and enforcing the applicable laws.").

Any Emulex argument that a permanent injunction here will result in market disruption should be accorded little weight. Emulex has stated publicly that it will "take appropriate steps to ensure continued product supply and support" despite the Court's post-trial judgment that Emulex infringes the '150 patent. (Liss Decl. Ex. B (Emulex Press Release dated October 13, 2011).) In addition, Emulex has represented that allegedly noninfringing alternatives to Broadcom's patented technologies exist. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Furthermore, the proposed injunction will not appreciably narrow the choices available to end-users. Broadcom's 10GbE chips include the current-generation BCM57712 (which is competitive with both BE2 and BE3), and the upcoming BCM57800, BCM57810, and BCM57840 (which compete most directly

1  with BE3).  Each is capable of serving as a 10GbE NIC or as an iSCSI HBA or

2  FCoE adapter.  (Liss Decl. Ex. I (Broadcom 10GbE Product Briefs).)  ████

3  ████████████████████████████████████████████████████

4  ██████████████████████████████████████████████████████

5  ██████████████████████████████████████████████████

6  ██████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ████████████████████

10      Even those few end-users that require immediate FCoE capability would not

11  be substantially harmed.[25]  After rigorous testing, Broadcom's FCoE

12  implementation was certified by prominent industry approvers EMC and NetApp.

13  (Lusinsky Decl. at ¶ 14.) ████████████████████████████████

14  ██████████████████████████████████████████████

15  ████████████████████  And a recent evaluation suggests that

16  Broadcom's FCoE products outperform Emulex's.  (Liss Decl. Ex. AF (Demartek

17  Broadcom FCoE/iSCSI Adapter Evaluation); Lusinsky Decl. at ¶ 14.)[26]

18          **b.    The scope of Broadcom's proposed injunction is
                  narrowly tailored and reasonable.**

19

20      Broadcom's proposed injunction is intended to prevent Emulex's continued

21  infringement – no more, and no less.  The injunction is thus "narrowly tailored" to

22  remedy only "the specific harms shown by the plaintiff[.]"  *Price v. City of*

23  [25] ██████████████████████████████████████████████████

24  ██████████████████████████████████████████████████

25  ██████████████████████████

26  [26] Furthermore, Broadcom's proposed injunction would not affect all of Emulex's
    Fibre Channel switches, and customers would still have access to a wide variety
27  of Fibre Channel switches from various suppliers.

1   *Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).  Several characteristics of the

2   proposed injunction demonstrate the reasonable scope of Broadcom's proposal:

3   • Broadcom seeks only prospective relief; the injunction does not, for

4   example, require the destruction of infringing products already sold.[27]

5   • The proposed injunction prohibits only domestic activity – it does not

6   apply to extraterritorial conduct.[28]

7   • The injunction permits designing around Broadcom's patents and

8   permits design, development, and testing undertaken to further that

9   cause.[29]

10  • The proposed injunction applies only to those specific products found

11  to infringe and those "not colorably different therefrom."[30]

12  Because Broadcom's proposed injunction will work little (if any) tangential

13  harm to non-parties, *see* Part 4(a), *supra*, no sunset provision is warranted here.  A

14  sunset provision would have the effect of granting Emulex a (temporary)

15  compulsory license, which is "antithetical" to the "basic tenet of the patent

16  system."  *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 795 (E.D. Va.

17

18  [27] *See Smith & Nephew, Inc. v. Arthrex, Inc.*, No. 2:07-cv-335-TJW-CE, 2010 WL

19  2522428, at *3 (E.D. Tex. Jun. 18, 2010) ("Any harm to the public will be
    minimized by the narrowly tailored scope of the injunction, which only

20  prohibits future acts of infringement and does not remove the already sold
    infringing products from the marketplace.") (citing *i4i*).

21  [28] *See Spine Solutions v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305,

22  1317 (Fed. Cir. 2010) (vacating extraterritorial portion of injunction).

23  [29] *See TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 883 (Fed. Cir. 2011)
    ("legitimate design-around efforts should always be encouraged as a path to

24  spur further innovation").

25  [30] *See Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004)
    ("the only acts [an] injunction may prohibit are infringement of the patent by

26  the adjudicated devices and infringement by devices not more than colorably

27  different from the adjudicated devices.").

**HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY**

24

**BROADCOM MEMORANDUM IN SUPPORT OF
MOTION FOR ENTRY OF
PERMANENT INJUNCTION**

1   1998).[31]  Furthermore, the upcoming Romley cycle will spur significant growth in

2   the 10GbE market.  (Lusinsky Decl. at ¶¶ 6, 22.)  Emulex should not be permitted

3   to capitalize and expand upon its incumbent status in certain segments of the

4   10GbE market by continuing to use Broadcom's proprietary technology against it.

5     An immediate injunction is particularly appropriate here given Emulex's

6   head-in-the-sand tactics.  Emulex made a "conscious decision" to avoid asking its

7   10GbE suppliers for schematics, and to take *no* steps to design around Broadcom's

8   patents, including with respect to products that were still in development

9   throughout this litigation.  *See* Part G, *supra*.[32]  Broadcom gave Emulex early and

10  oft-repeated notice of its intention to seek an injunction; a compulsory license,

11  whether in place of injunctive relief or as part of a sunset provision, would

12  effectively reward Emulex for its inaction.

13  **IV.** **CONCLUSION**

14    For the reasons given, Broadcom respectfully requests that the Court enter a

15  permanent injunction that enjoins Emulex's infringement of the '150 and '691

16  patents in the form Broadcom has proposed.

17

18  Respectfully submitted,

19

20  Dated:  January 6, 2012    By: _____

21              Michael D. Jay

22

---

23  [31]  *See also Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe*

24    *Corp.*, Civ. No. H-03-2910, 2006 WL 3813778, at *5 (S.D. Tex. Dec. 27, 2006)

25    (awarding permanent injunction in part because compulsory license would "not

  contain any of the commercial business terms typically used by a patent holder

26    to control its technology or limit encroachment on its market share").

27  [32]  *See also* Part III of Appendix A.

**HIGHLY CONFIDENTIAL**
**OUTSIDE ATTORNEYS' EYES ONLY**   25   **BROADCOM MEMORANDUM IN SUPPORT OF**
**MOTION FOR ENTRY OF**
**PERMANENT INJUNCTION**

ACTIVEUS 91913249v3