1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>EMULEX CORPORATION,<br><br>Defendant. | CASE NO:<br>SACV 09-1058 JVS (ANx),<br>consolidated with SACV 10-3963 JVS (ANx)<br><br><br>MEMORANDUM OF DECISION RE INJUNCTIVE RELIEF |

This action was brought by Broadcom Corporation ("Broadcom") against Emulex Corporation ("Emulex") for alleged infringement of a series of United States Patents, only some which were presented at trial. After a three-week trial, the jury returned a damage verdict[1] in favor of Broadcom for direct infringement on Broadcom's U.S. Patent No. 7,050,150 ("'150 Patent"), and either hung or returned a verdict in favor of Emulex on the remainder of the patents tried.

---

[1] At the conclusion of evidence, the Court directed a verdict on liability on the '150 Patent, and the jury was advised that infringement had been established. (Trial Tr. Oct. 5, 2011, p. 183; Docket No. 896, Special Verdict, Question No. 11.)

1

(Docket No. 896.)  On Broadcom's Motion for Judgment as a Matter of Law with respect to its U.S. Patent No. 7,471,691 ("'691 Patent"), the Court granted judgment of liability, and reserved the issues of damages and wilfulness for a new trial.  (Docket No. 993, p. 7.)

Before the Court now is Broadcom's Motion for a Permanent Injunction enjoining infringement of the '150 and '691 Patents by certain Emulex products.[2] (Docket No. 1003.)  Emulex opposes the Motion (Docket No. 1036), and Broadcom has replied (Docket No. 1070).

Broadcom proposes the entry of an immediate injunction prohibiting infringement of the '150 and '691 Patents.  (Docket No. 999-1.)  Emulex opposes injunctive relief in any form, and proposes that the Court order an on-going mandatory royalty.[3]  (Docket No. 1036, p. 3.)

After oral argument, the Court allowed Emulex to supplement the record in response to deposition testimony offered by Broadcom in its Reply from depositions taken after Emulex had submitted its Opposition.  (Docket No. 1077.) The Court had earlier rejected a full-scale surrebuttal as an unwarranted.  (See Docket No. 1073.)  The Court now believes that it has a full record upon which to rule, and that the parties have had a fair opportunity to present their arguments and supporting evidence.

---

[2]'150 Patent: Emulex BE2, BE3, Lancer (XE201), SOC442; '691 Patent: Emulex SOC320, SOC422, SOC442, Sequoia.

[3]The jury's award of damages on the '150 Patent reflects an implicit royalty of 3 percent. Because the jury hung on the '691 Patent infringement claim, no jury finding–either explicit or implicit–was made concerning a reasonable royalty under the '691 Patent.  However, Broadcom's expert Julie Davis advanced the same 3% rate for both patents.

I.      <u>Legal Standard.</u>

In <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006), the Supreme Court reaffirmed that the traditional requirements for injunctive relief control in patent cases:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

As the Court noted, "[t]hese familiar principles apply with equal force to disputes arising under the Patent Act."  (<u>Id.</u>)

The grant or denial of permanent injunctive relief is committed to the equitable discretion of the Court.  (<u>Id.</u>)

In fashioning injunctive relief, the Court has the power under appropriate circumstances to permit continued infringement upon on-going payment of a mandatory royalty.  <u>Paice LLC v. Toyota Motor Corp.</u>, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007).

II.     Characteristics of the Market Place.

     The Court examines the characteristics of the market place because those characteristics affect several aspects of the basic analysis, especially the Court's assessment of irreparable harm and the public interest.

     A.  Competition through a System of "Design Wins."

     The market for 10-gigabyte Ethernet ("10GbE") chips is peculiar in that sales come in the form of "design wins," rather than a steady flow of discrete product sales.  The customers for these products are a limited set of original equipment manufacturers (OEMs) who supply the majority of the server market, including Hewlett-Packard ("H-P"), International Business Machines Corporation ("IBM"), Dell, and Cisco.  These firms typically solicit bids by way of design competitions to meet the needs of each new product line and each new generation. The firm that wins the competition in essence becomes the provider of the chip for the life cycle of that particular OEM product.   This is so because of the complexity of the OEM's products and the extensive period necessary to develop and bring its products to market leave little if any room for altering course once the winner of the design competition is chosen.  In essence, the successful supplier's product is designed into the OEM's product.

     A successful firm not only wins a sale but benefits from two additional effects.  First, the winner secures a blocking position that immunizes the winner for a period of time from competitive products which may be brought to market following the "design win."  In this kind of a market, the exclusion has an effect on firms even if they do not have an immediately available product. When an OEM has made a supplier decision, it matters not–until the next product cycle

4

begins–that another competitor may have or later brings to the market a cheaper
and/or technically superior product.   Second, and perhaps at least as significant,
the winner enhances its ability to compete for successive design competitions.[4]
This is sometime referred to as the incumbency effect.

From the standpoint of ensuring the fair exploitation of intellectual property
rights, it is essential that design wins occur in a setting that respects all parties'
intellectual property rights.

B.  Competitors.

Though the analysis is definitely nuanced, Broadcom and Emulex are
competitors in the products covered by the '150 and '691 Patents and more widely
in the 10GbE  market.  The latter point is made abundantly clear by Emulex in its
separate antitrust suit.  (Emulex Corp. v. Broadcom Corp., SACV 09-1310 JVS,
Docket No. 19, Emulex First Amended Complaint, ¶ 27.)  Similarly, Emulex'
senior executives have stated that the two firms compete in the Ethernet
environment.  (E.g., McCluney Depo., p. 168; Trial Tr. Sept. 28, 2011, p. 79 ("We
are now a partner competing with Broadcom on FCoE." (McCluney).)  In his
declaration filed in support of Emulex' opposition, Emulex Senior Director of
Marketing Joseph Gervais states: "Emulex's primary competitors for 10Gbps
Ethernet are Intel and Broadcom."[5]  (Gervais Decl., ¶18.)

The 10GbE controller chips haves become the state of the art in

[4]See text at footnote 19, infra.

[5]He qualifies this with the statement that Broadcom is not a competitor for converged
Ethernet.  (Gervais Decl., ¶ 19.)

5

communications networks.  Broadcom's products include the BCM57710 and BCM 57711 and its next generation products BCM57800, BCM57810, and BCM57840.  (Lusinsky Decl., ¶ 11.)  Emulex' BladeEngine chips, the BE2 and BE3, compete directly with Broadcom's product line.  (Id., ¶12.)  Emulex' next generation chip, the Lancer[6] or XE201, will likewise compete with Broadcom's offerings.  To be sure, Broadcom does not compete in the pure Fibre Channel segment, but that is not the end of the discussion.

There is similar competition between Broadcom and Emulex in storage switches.  Broadcom offers the BCM56840, successor to the BCM56820.  Emulex' competitive products are found its "InSpeed" line, the SOC320, SOC422, and SOC442.

If one looks at design competitions, Emulex and Broadcom have engaged in significant competition at H-P, and Emulex prevailed over Broadcom for H-P's *Westmere* and *Romley* competitions.  Broadcom nevertheless had the opportunity to compete.

Emulex attempts to diminish, if not eliminate the notion that the two firms are competitors, but those efforts are successful only in pointing out the complex nature of the market.  For example, the accused InSpeed 320, 422, an 442  are Fiber Channel products, and Broadcom has offered only Fiber Channel over Ethernet ("FCoE")  products. Yet the two types of protocols can both meet the same needs.  And at Dell, Broadcom's FCoE product prevailed in a design

---

[6]At oral argument, Emulex contended that the Lancer is not available for Ethernet applications.  However, as Broadcom pointed out, the Lancer datasheet reflects that the chip can be used in Ethernet applications.  (Liss Decl., Ex. J, fifth page, Datasheet, Emulex Engine XE201 [Lancer].)

6

competition (Lusinsky Decl., ¶ 28), and Broadcom has gained certification for its

FCoE products at EMC and NetApp.  Indirect competition is no less competition.

Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 703 (Fed. Cir. 2008).[7]

The Court turns to the patents in issue here.

III.   The '150 Patent and '691 Patent.

Because the analysis is substantially the same for both patents, the Court

analyzes the requirement just once, noting where there are salient facts which have

particular bearing on only one of the patents.

A.  Irreparable Harm.

The Court looks at a number of indicia.

*Design Win Process.*  The Court finds that actual and potential exclusion

from a fair opportunity to compete for design wins constitutes irreparable harm.

The court in Hynix Semiconductor Inc. v. Rambus Inc., 609 F. Supp. 2d 951, 981-

82  (N.D. Cal 2009), summed up the harm:

While Rambus may collect royalties from such licensing [when it loses a

design win to an infringing alternative], Rambus is shut out of the

"innovation loop." This prevents Rambus from working closely with the

---

[7]Emulex marshals quotations from various Broadcom officials who appear to be ignorant
of the type of competition, particularly indirect competition, which Broadcom assert in its
Motion.  (Opposition, Motion, pp. 12-14 & Appendix A.)  Whatever these shortcomings, the
statements of Emulex' own officials are sufficient to establish competition in fact.

users of its technology and hampers Rambus's ability to identify technical
problems and direct its research efforts to solve them. Though the phrase
"innovation loop" may sound corny, Rambus's exclusion from it is precisely
the type of harm that money damages cannot remedy. Losing at the design
stage also harms Rambus's ability to cultivate the goodwill it might have
garnered had its design been adopted. This loss of potential goodwill caused
by Rambus's loss of market share unquantifiably impacts Rambus's business
relationships going forward.[8]

The notion that a firm sustains irreparable harm only it offers a precise  product-
for-product replacement is too narrow and ignores that true scope of competition in
the market place.   Indeed, one need not even necessarily be a direct competitor to
suffer irreparable harm sufficient to support an injunction.  eBay, 547 U.S. 393-94;
Commonwealth Scientific and Industrial Research Organisation v. Buffalo
Technology Inc., 492 F. Supp. 2d 600, 605 (E.D. Tex. 2007).

    In its Opposition, Emulex does not respond to Broadcom's showing that it
has lost market share which Emulex executives have traced to Emulex.  (Liss Decl,
Ex. P, at pp. 12, 20; Benck Depo., pp. 131-33; Gervais 30(b)(6) Depo., p. 137
(Broadcom's share of the 10gbE market "has dropped significantly").)   This is a
clear measure of competition and harm.

    An noted earlier, the incumbency effect compounds the structural
ramification of a design win.  As Emulex founder Paul Folino noted, if you lose

---

[8]Emulex correctly notes that this harm did not stop the Hynix Semiconductor court from
denying an injunction (Opposition, pp. 18-19), but only because such relief would have
"decimated" Hynix.  Hynix, 609 F. Supp. 2d at 984.

8

incumbency status, it is "harder" to break back into the market.  (Folino, Depo., p. 52.)

*Broadcom Licensing Practices.*  Emulex asserts that  Broadcom's past licensing practices and public statements make clear that monetary damages are sufficient.  Emulex puts the greatest weight on Broadcom's decision to license the '150 patent to Intel, an industry leader and a direct Broadcom competitor.  Yet that license was part of a cross-licensing arrangement in the context of resolving litigation.  While the willingness to license a competitor may be significant, the context of litigation, in which Broadcom granted and receive protection for intellectual property, substantially diminishes the point.[9]  Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1327-28 (Fed. Cir. 2008).

Nor does Broadcom's assurance to an IEEE standards group that it would license technology necessary to practice the IEEE standard being developed change the analysis.  There is no showing here that the '150 Patent is necessary to practice the standard.  There is no indication that the IEEE standards cited by Emulex in fact implicate the '150 Patent.  (Gervais Decl., ¶ 6.)  Moreover, Emulex' declarant on IEEE standards was not aware of anyone at Emulex ever taking the position with the IEEE that practice of the '150 Patent was essential to meet those standards.  (Gervais Depo., p. 331.)   The testimony of Broadcom employee Thomas Lagatta that Broadcom's 10GbE controllers practice the IEEE standards sheds no light on whether practice of the '150 Patent is essential to meeting those standards.[10]  (See Opposition, Appendix A, p.13, citing Lagatta Depo., pp. 53-54.)

---

[9]The Agere license was also a cross-license born out of litigation between the parties. (Lamberson Decl., Ex. 30, p. 1.)

[10]Similarly, the seeming thunder-bolt testimony of Broadcom employee Nicholas Ilyadis that anything with a 10GbE interface practices the '150 Patent evaporates when one realizes that

The most the present record reveals is that it would be easier to meet those standard with the '150 Patent.  The proposition that Broadcom committed to the IEEE to license the '150 Patent is unsupported.

Emulex does not point to a single instance where Broadcom individually licensed either the '150 Patent or the '691 Patent.  (Trial Tr. Oct. 5, 2011, p. 85.)  That is consistent with Broadcom's preference <u>not</u> to license its intellectual property.  (<u>Id.</u>)

*Claim for Lost Profits or Pretrial Equitable Relief.*  In assessing irreparable harm, the Court does not find significant the fact that Broadcom did not seek lost profits for its patents, or that it did not seek a preliminary injunction. (Opposition, pp. 17-19.)   The Federal Circuit has "never held . . .that in order to establish irreparable harm a patentee must demonstrate that it is entitled to lost profits." <u>Mytee Products, Inc. v . Harris Research, Inc.</u>, 439 Fed. Appx. 882, 887 (Fed. Cir. 2011).   Nor is the failure to move for a preliminary injunction a bar to permanent relief.  (<u>Id.</u> at 888;  <u>Hybritech Inc. v. Abbott Labs.</u>, 849 F.2d 1446, 1457 (Fed. Cir.1988).)

*Past Harm.*  Finally, Emulex' observation that "[a]n immediate injunction cannot remedy Broadcom's alleged harm for [past] design cycles" is true but telling. (Opposition, p. 17.)  Implicit in the statement is the acknowledgment that lost design wins can cause irreparable harm, and that is what an injunction with prospective effect is designed to eliminate.  Moreover, the Federal Circuit has recognized that past harm "is relevant for determining whether the patentee has suffered an irreparable injury." <u>i4i Ltd. Partnership v. Microsoft Corp.</u>, 598 F.3d

---

he is talking about <u>Broadcom</u> products.  (<u>See</u> Opposition, Appendix A, p.13, citing Ilyadis Depo., p. 158.)

831, 861-62 (Fed. Cir. 2010) (internal quotation marks and emphasis omitted).

The Court concludes that Broadcom has established irreparable harm.

B.  Sufficiency of Monetary Damages.

Emulex argues that Broadcom's past licensing practices and public
statements make clear that monetary damages are sufficient here.

The Court finds that monetary damages would not be sufficient to
compensate for the exclusionary effect of design competition wins garnered with
the benefit of infringing technology.  Nor do Braodcom's licensing practices lead
to a different conclusion,  particularly where Broadcom has never licensed the '150
or the '691 Patent individually.  Likewise, the argument that a small damage award
could compensate for exclusion and the loss of incumbency benefits is not
convincing.  (Opposition, p. 20, citing Paice LLC v. Toyota Motor Corp., 2006
U.S. Dist. Lexis 61600 at *15 (E.D. Tex. Aug. 16, 2006).)

C.  Balance of Hardships.

While the effect of an injunction on third-parties does not bear directly on
the balance of hardships, the Court takes into account its decision to order a period
of mandatory licensing, a so-called "Sunset Period."

Emulex concedes that potentially enjoined sales would amount to about
3.2% of annual revenues (Opposition, p. 21), but notes that other products would
be impacted as well.  (Id.)  Emulex does not quantify that additional loss, but

11

Broadcom places it at 5-6% of annual revenue.[11]  (Liss Reply Decl., Ex. N, Davis Depo., p. 424-31.)   In any event, this is certainly not a case where "an injunction would decimate [Emulex'] business."  Hynix Semiconductor, 609 F. Supp. 2d  at 984.

Emulex cannot claim harm from loss of incumbency advantages predicated on infringement.  Broadcom Corp. v. Qualcomm Inc., 543 F.3d at 704.  Indeed, substantial harm flows to Broadcom, not Emulex, where Broadcom is forced to compete against its own patents.  Robert Bosch LLC v. Pylon Manufacturing Corp., 659 F.3d 1142, 1156 (Fed. Cir. 2011).

Nor is an analysis of the balance of hardship affected by the relative size of the parties here.  (Id. ("A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one.").)[12]

With regard to the '691 Patent, Emulex somewhat curiously asserts that "an injunction will harm Emulex's reputation and drive customers to its sole competitor QLogic."  (Opposition, p. 27.)  The Court doubts that a monetary judgment for infringement carries less of a stigma for engaging in unlawful conduct than an equitable judgment, but in any event, that sort of harm is not part of the balance.[13]

_____

[11]However, Bruce Warren, Emulex Senior Director of Engineering, offers that the InSpeed product line will account for 8% of Emulex' overall revenue in Emulex FY13 and FY14.  (Warren Decl., ¶ 24.)  The Court finds it difficult to compare this number to Broadcom's estimate of revenues from the infringing products.

[12]Emulex' citation of LG  Electronics U.S.A., Inc. v. Whirlpool Corp., 798 F. Supp. 2d 451, 564 (D. Del. 2011), assumes disproportionate market share which simply do not exist here.

[13]Moreover, to the extent that Emulex points to alternative sources to meet customer demand, its public interest argument loses some of its force.

12

Lost market share, exclusion from design wins, and loss of incumbency benefits are all hardships which Broadcom will sustain without an injunction.

The balance of hardships tips in favor of Broadcom.

D.  Public Interest.

The public interest favors the enforcement of intellectual property rights. Abbott Laboratories v. Andrx Pharmaceuticals, Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006); Rite-Hite Corp. v Kelley Co., Inc., 56 F.3d 1538, 1547 (Fed. Cir. 1995); MGM Well Services, Inc. v. Mega Lift Systems, LLC, 505 F. Supp. 2d 359, 379-80 (S.D. Tex. 2007).   The courts have recognized an exception where public health and safety are affected.  Xerox Corp. v. 3Com Corp., 61 Fed. Appx. 680, 685 (Fed. Cir. 2003) ("The important public needs that would justify the unusual step of denying injunctive relief, however, have typically been related to public health and safety."); Belden Technologies Inc. v. Superior Essex Communications LP, 802 F. Supp. 2d 555, 579 (D. Del. 2011).  However, in Broadcom Corp. v. Qualcomm Inc., 543 F.3d at 704, the Federal Circuit found no abuse of discretion where the district court in effect denied a full injunction through the use of a sunset royalty in a non-safety, non-medical context in order to avoid immediate market disruptions.  See Presidio Components Inc. v. American Technical Ceramics Corp., 723 F. Supp. 2d 1284, 1339 (S.D. Cal. 2010) (public interest affected where an injunction would "hurt important government, military, space, and infrastructure projects, as well as many critical civilian industries").

Emulex has made a showing of the effects of an injunction on two of its major customers, H-P and IBM, and NetApp, which the Court discusses below. However, as  Broadcom points out, there is no showing that an injunction would

13

have any effect on other Tier One server manufacturers, Dell and Cisco. (Reply, p. 23.) Nor is there any direct evidence concerning the impact on potential customers who have qualified the Emulex' infringing products, including EMC, Hitachi, Fujitsu, and Brocade.[14] More broadly, there is no evidence before the Court concerning the impact of an injunction on the availability of high-end servers generally in the market place.[15]

The Court is satisfied that replacement or redesign of an infringing chip is a complicated process that requires new development, interaction between the chip supplier and the manufacturer, and potential hardware and software modifications so that a new chip will function in the device. This would be true if the goal is to incorporate a redesigned Emulex chip or an existing Broadcom chip. There are no "off-the-shelf" substitutes, such as one might imagine in replacing radio tubes in the mid-Twentieth Century.

The record provides some insight into how long it would take to replace or redesign an infringing chip.

*Emulex' Estimates.* Emulex essentially relies on the time estimates of its suppliers and customer to describe the time requirements for a redesign. However, through Emulex Director of Design Test Verification Stan Robinette, Emulex provides a detailed description of the testing required for the products in issue here,

---

[14]In its Supplemental Brief, Emulex offers the testimony of its employee Gervais on the effects on Hitachi and Fujitsu, but no testimony from those companies themselves. (Docket No. 1088, Supplemental Brief, p. 4 (citing Gervais testimony).)

[15]In its Supplemental Brief, Emulex offers hearsay from its own employee, Evashenk, about concerns expressed by customers for high-end servers. (Docket No. 1088, Supplemental Brief, p. 4 (citing Evashenk testimony).) Like all substantive rulings, the grant of an injunction should be based of admissible evidence. While second-hand statements may be admissible for notice, they do not establish reality on what is obviously a key point.

including historical data for various tasks in testing the BE2.  (Robinette Decl.,
*passim*.)  But it should be noted that his description was not tied to the actual
requirements for redesigning the BE3 or Lancer.  (Robinette Depo., pp. 49-52.)
And with regard to any Sunset Period, Emulex' Gervais states, without detail, that a
24-month period would allow Emulex to meet its outstanding *Westmere* and *Romley*
obligations. (Gervais Decl., ¶ 34.)

*Emulex' Supplier Estimates.*  LSI, manufacturer of the BE3 and Lancer,
estimates that it would take 18-24 months to deliver redesigned products.[16]  (Allen
Decl., ¶ 8.)  Although Emulex had indicated that it does not plan to redesign the
SOC442 (Evashenk Depo, 147-48, 215), Toshiba America Electronics Components
estimates that it would take 19.5 months to redesign the SOC442 which it supplies
to Emulex.  (Welch Decl., ¶ 6 & Ex. 1.)  Renesas' estimate of 26-39 months to
redesign the clock circuitry for the BE2 is similarly somewhat irrelevant.
(Hiiragazawa Decl., ¶ 4 & Ex. 1.)[17]

*H-P's Estimates.*  H-P makes use of both the BE2 and the BE3 in its server
products.[18]  Robert Gennaro of the H-P Business Critical Solutions group notes that
if these chips were unavailable, the best solution would be a redesigned Emulex
chip or a QLogic chip.  (Gennaro Decl., ¶ 17.)  He believes that this would take at

[16]The estimate provided by Dr. Phillip E. Allen is somewhat suspect on a number of grounds.  He was retained by LSI to render the opinion.  (Allen Decl., ¶ 2.)  But in the course of forming the opinion, he spoke to no one at LSI, did not review the LSI schematics, and worked only from "generic information."  (Allen Depo., pp. 27, 34, 108.)  Moreover, he had never designed clock and data recovery circuitry.  (Id., 59.)

[17]Broadcom moved to strike the Hiiragazawa Declaration because of compromised access to Renasas schematics during the course of the litigation.  (Docket No. 1024.)  While the Court declined to strike the declaration (Docket No. 1067), the Court gives it little weight, in part because it relates to the BE2, in part because the declaration is in large measure conclusory.

[18]The Court notes that Emulex has no plan to redesign its BE2 chip, or to use it in future design competitions. (Evashenk Depo, pp. 147-48, 215; Evashenk Decl., ¶ 20.)

15

least a year.  (Id.)  However, he notes that prior experience with a manufacturer can reduce this time.  The BE2 was qualified in 14 months, but qualification of the BE3 took only 6 months.[19] (Id., ¶ 22.)   An immediate cessation of the shipment of the BE2 and BE3 chips would affect current production and the development of H-P's next generation "Tiger" product.  (Id., ¶¶ 26, 30.)

Chris Hughes, head of the H-P Networking Product Development in the Industry Standard Servers Division, indicates that the BE2 and BE3 are used in the G7 severs, and that the BE3 will be used in G8 servers based on the Intel *Romley* chip.  (Hughes Decl., ¶¶ 8, 13.)  Qualification for the G8 has taken 14 months.  (Id., ¶ 15.)  Significantly, he notes that Broadcom's 10GbE chips are customer options for the G8 servers.  (Id., ¶ 13.)  H-P is also in the process of qualifying QLogic for the G8 servers with a November 2012 target date.[20]  (Id., ¶ 31.)  He also notes that the FCoE feature which Emulex offers has enjoyed only "small adoption rates," but customers are demanding it. (Id., ¶ 32; see Newfell Decl., ¶¶ 8-9.)  A cessation of Emulex chips would stop G7 production and would force a choice of an alternative for the G8 design.

*IBM's Estimates.*  IBM uses the SOC442 in its DS8000 series of servers and in its System Storage Tape Controller Model C07.  (Gupta Decl., ¶¶ 15, 17.)  IBM estimates that it would take "upwards of thirty months" to reengineer these products for a substitute chip.  (Id., ¶ 21.)  IBM uses the BE2, BE3, and Lancer in its rack and blade servers.  (Id., ¶25.)  IBM estimates that it would take 12 to 18 months to complete its portion of the redesign for any alternative chip.  (Id., ¶ 27.)  Cessation

---

[19]This is a clear example of the benefits of incumbency.

[20]In his deposition, Hughes moved the date to first quarter 2013.  (Hughes Depo., pp. 61-62.)

16

of delivery of the Emulex devices would result in disruption of IBM's ability to
meet current and future customer needs.  (Id., ¶¶ 32-34.)

*NetApp's Estimates.*  NetApp uses the BE2 and SOC422 in its products.
David Mason of NetApp provides a general estimate that it would take 14-16
months between selection of a chip vendor and first product shipment.  (Mason
Decl., ¶ 5.)  He does not address the specifics of replacing the BE2 or SOC422.  An
immediate cessation of shipment of the Emulex devices would disrupt current
production and development.  (Id., ¶ 6.)

The Court concludes that in granting an injunction, protection of the public
interest must figure in the analysis and the result.

III.    Remedy.

Considering all the factors bearing on the grant of equitable relief, the Court
finds that the grant of a permanent injunction with a narrow and limited Sunset
Provision appropriately balances the public interest and all the other factors.  The
Court outlines the Sunset Provision and then addresses Emulex' objections to the
Broadcom's proposed form of injunction.

A.  Sunset Period and Terms.

The Court adopts the following terms:

*Sunset Period.*  It is difficult to approximate the time to develop non-
infringing substitutes and for customers to bring to market products embodying
those substitutes.  The Court is somewhat skeptical of the estimates because of the

inherent self interest of those making the estimates.  Moreover, there are more favorable experiences than those which Emulex put before the Court, such as Broadcom's FCoE qualification at Dell in 4-6 months.  (Lusinsky Depo., p. 32.) However, taking all the information before the Court, the Court believes that an 18-month period is reasonable.  The period starts from the date of the jury's damage verdict with respect to the '150 Patent, October 12, 2012, and the date the Court granted Judgment as Matter of Law on the '691 Patent, December 16, 2012.   By these dates at the latest, a reasonably prudent firm accused of infringement would have either ceased infringement and/or begun design-around efforts to avoid infringement

*Sunset Sales.*  The customers with the greatest interest in a continued supply of the infringing devices are those who have qualified an infringing device and who have already placed firm orders for production quantities.  Emulex would thus be permitted during the Sunset Period to sell only to an existing customer who has (a) qualified an infringing product and only for the specific customer device(s) for which the infringing product has been qualified; and (b) placed a firm order for productions quantities prior to the commencement of the Sunset Period. "Production quantities" are any purchases in excess of those necessary for testing and development.  An infringing device sold under the Sunset Provision shall be in substantially the same design configuration on the date of the jury's verdict in the case of the '150 Patent and the date on which the Court granted JMOL on this claim in the case of the '691 Patent.[21]

---

[21]The Court anticipates that the parties would meet and confer to develop a list of qualified customers and customer devices.  To the extent that there are disputes, the Court is prepared to resolve such disputes promptly.  The Court strongly believes that the permissible scope of Sunset Sales should be defined at the outset.

The Court's adoption of this two-fold test reflects a balancing of the needs of Emulex customers with the protection of Broadcom's patent rights.  The Court concedes that this not a perfect solution from the standpoint of Emulex customers.  For example, as discussed at oral argument, H-P's efforts to qualify Emulex products for its next-generation Tiger servers began in mid-2011, and orders in production quantities are some time off.  H-P's sunk development costs would be one of the potential casualties of attempting to strike a balance.

*Sunset Royalty.*  The Court finds that a royalty of 3% of the selling price of the Emulex product embodying the infringing product represents a reasonable royalty for an arm's-length transaction.  Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). This is the rate implicitly found by the jury in awarding damages for violation of the '150 Patent and the rate testified to by Julie Davis, Broadcom's damage expert.  However, that is not the appropriate royalty where the Court in essence affords a license for what now is willful infringement.  The Court orders a trebled royalty of 9% on all sales made during the Sunset Period.  35 U.S.C. § 284; Broadcom Corp. v. Qualcomm Inc., SACV 05-467 JVS (RBNx), pp. 19-20.

An accounting for royalties would be due the fifteenth day after the close of each calendar quarter and payment due within 30 days after the close of each calendar quarter.[22]

*Specific Restriction.*  Emulex would not be permitted to participate in any new design competition or to benefit from any infringing product qualified by a customer where the program had not matured into a production order on the basis of

---

[22]The Court appreciates that some adjustment may be appropriate for the first accounting given the extended period to be covered and the date of the issuance of the injunction.

any infringing product.  Emulex has signaled its agreement to a restriction on future design competitions.[23]  (Opposition, p. 22.)

In providing a narrow Sunset Provision, the Court is influenced by the fact that Emulex did began to pursue non-infringing designs until after the jury and the Court had made their findings of infringement.[24]  (Genarro Depo.,  pp. 86-88; Evashenk Depo., pp. 137-139; Evashenk Decl., ¶ 17.)  While it may not have been willful to fail to assess the chips designs of its suppliers, it is clear that some portion of any delay in bringing redesigned products to market is of Emulex' own making.  (See generally Motion, Appendix A, part III.)

B.  Objections to Form of Injunction.

In the revised Proposed Permanent Injunction which Broadcom submits with its Reply, Broadcom  responds to certain Emulex objections.  Several objections remain.

The Court rejects the notion that the injunction must be limited to the type of conduct which was found to infringe; namely, selling infringing devices.   The proposed injunction is not so broadly crafted so as to compel blanket compliance with the law but rather is focused on "acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined."  N.L.R.B. v. Express Pub. Co., 312 U.S.

[23]For example, it would seem particularly unfair to allow Emulex to go forward with an H-P development effort for the BE3 and Lancer which was initiated just before trial.  (See Newfell Depo., p. 25; Genarro Depo., pp. 131-32.)

[24]As noted above, the Court rather than the jury made the determination of infringement of the '150 Patent as a matter of law.

426, 435 (1941); <u>Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.</u>, 518 F. Supp. 2d 1197, 1226-27 (C.D. Cal. 2007).  The list of enjoined products and  act relates to the infringement found.

The Court agrees that the requirement in Section III to place notices on foreign sales is beyond the scope of the present suit.  The sales upon which Broadcom focuses are outside the scope the patent laws.  <u>Microsoft Corp. v. AT&T Corp.</u>, 550 U.S. 437, 455 (2007).

Section V of the Amended Proposed Permanent Injunction provides for repair, consistent with the case law.  Neither of Emulex' cases support a right to improve a product through upgrades.  <u>FMC Corp. v . Up-Right, Inc.</u>, 21 F.3d 1073, 1077 (Fed. Cir. 1994) ("mere <u>replacement</u> of broken or worn-out part . . . is no more than the lawful right of the owner to repair his property") (emphasis supplied); <u>Husky Injection Molding Systems Ltd. v. R & D Tool Engineering Co.</u>, 291 F.3d 780, 786-87 (Fed. Cir. 2002) (same).

The Court finds that the notice provision in Section VI of the Amended Proposed Permanent Injunction is proper to ensure that all parties associated with the manufacture and sale of the infringed products are informed of the restrictions which the Permanent Injunction imposes.  Emulex' concern about being held in contempt for the record keeping activities of others appears to be without basis, particularly given the high standards for contempt.  <u>In re Dual-Deck Video Cassette Recorder Antitrust Litigation</u>, 10 F.3d 693, 695 (9th Cir. 1993); <u>KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc.</u>, 776 F.2d 1522, 1524 (Fed. Cir. 1985) ("the movant bears the heavy burden of proving violation by clear and convincing evidence").

V.    Conclusion.

The Court finds that a Permanent Injunction should issue with provision for a Sunset Period, as noted above.  The Court has balanced the right of Broadcom to not simply enjoy the benefits of it patents but to be free from competitive challenges using its own intellectual property, on the one hand, with the hardships which Emulex will sustain and the effects on the public, on the other hand.  The Court believes that the tailored Sunset Provision adopted here strikes the right balance.

Broadcom is ordered to submit a revised form of Permanent Injunction within ten days.

DATED: March 16, 2012

_____
JAMES V. SELNA
UNITED STATES DISTRICT JUDGE